Barry I. Levy, Esq.
Michael A. Sirignano, Esq.
Joshua D. Smith, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs, Government Employees Insurance Company,*
*GEICO Indemnity Company, GEICO General Insurance Company*
*and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

| | |
|---|---|
| GOVERNMENT EMPLOYEES INSURANCE COMPANY, GEICO INDEMNITY COMPANY, GEICO GENERAL INSURANCE COMPANY and GEICO CASUALTY COMPANY, | Docket No.:_____ (     ) |
| Plaintiffs, | |
| -against- | **Plaintiff Demands a Trial by Jury** |
| SVETLANA FISH, PHYSICIAN, P.C., COMPLETE EXPRESS MEDICAL P.C. and SVETLANA FISH, M.D. | |
| Defendants. | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

## COMPLAINT

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company,

GEICO General Insurance Company, and GEICO Casualty Company (collectively "GEICO" or

"Plaintiffs"), as and for their Complaint against defendants, Svetlana Fish, Physician, P.C.,

Complete Express Medical P.C., and Svetlana Fish, M.D. (collectively, the "Defendants"), hereby

allege as follows:

1

## NATURE OF THE ACTION

1.      This action seeks to recover more than $159,000.00 that the Defendants wrongfully have obtained from GEICO by submitting and causing to be submitted, hundreds of fraudulent no-fault insurance charges relating to medically unnecessary, illusory, and otherwise non-reimbursable healthcare services, including cardiopulmonary exercise testing, cardiac and vascular diagnostic imaging studies, videonystagmography, and transcranial doppler studies (collectively the "Fraudulent Services"), that allegedly were provided to New York automobile accident victims ("Insureds").

2.      In addition, GEICO seeks a declaration that it is not legally obligated to pay reimbursement of more than $285,000.00 in pending no-fault insurance claims that have been submitted by or on behalf of Defendants Svetlana Fish, Physician, P.C., and Complete Express Medical P.C. (collectively the "Provider Defendants") because:

> (i)     the Fraudulent Services were not medically necessary and were provided – to the extent that provided at all – pursuant to predetermined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;
>
> (ii)    the Fraudulent Services were not causally related to the Insureds' motor vehicle accidents and were provided – to the extent provided at all – pursuant to predetermined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;
>
> (iii)   in many cases, the Fraudulent Services never were provided in the first instance;
>
> (iv)    the billing codes used for the Fraudulent Services misrepresented and exaggerated the level and type of services that purportedly were provided in order to inflate the charges submitted to GEICO;

2

    (v)    the Fraudulent Services were provided – to the extent provided at all – pursuant to illegal kickback and self-referral arrangements amongst the Defendants and others; and

    (vi)    the Provider Defendants were not lawfully licensed as they were nominally owned by a licensed healthcare provider who did not actually practice medicine through the professional corporations as required by law.

3.    The Defendants fall into the following categories:

    (i)    Defendant Svetlana Fish, Physician, P.C. ("Fish Medical") and Complete Express Medical P.C. ("Complete Express") are New York professional medical corporations through which the Fraudulent Services purportedly were performed and were billed to New York automobile insurance companies, including GEICO.

    (ii)    Defendant Svetlana Fish, M.D. ("Fish") is a physician licensed to practice medicine in New York who purported to own Fish Medical and Complete Express and purported to perform many of the Fraudulent Services submitted through Fish Medical and Complete Express.

4.    As discussed herein, the Defendants at all relevant times have known that:

    (i)    the Fraudulent Services were not medically necessary and were provided – to the extent provided at all – pursuant to predetermined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

    (ii)    the Fraudulent Services were not causally related to the Insureds' motor vehicle accidents and were provided – to the extent provided at all – pursuant to predetermined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

    (iii)    in many cases, the Fraudulent Services never were provided in the first instance;

    (iv)    the billing codes used for the Fraudulent Services misrepresented and exaggerated the level and type of services that purportedly were provided in order to inflate the charges submitted to GEICO;

    (v)    the Fraudulent Services were provided – to the extent provided at all – pursuant to illegal kickback and self-referral arrangements amongst the Defendants and others; and

(vi)    the Provider Defendants were not lawfully licensed as they were nominally owned by a licensed healthcare provider who did not actually practice medicine through the professional corporations as required by law.

5.      As such, the Defendants do not now have – and never had – any right to be compensated for the Fraudulent Services that were billed to GEICO through Fish Medical and Complete Express.

6.      The charts annexed hereto as Exhibits "1" and "2" set forth a representative sample of the fraudulent claims that have been identified to-date that the Defendants submitted, or caused to be submitted, to GEICO.

7.      The Defendants' fraudulent scheme began as early as 2020 and has continued uninterrupted since that time.

8.      As a result of the Defendants' fraudulent scheme, GEICO has incurred damages of more than $159,000.00.

## THE PARTIES

### I.    Plaintiffs

9.      Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. are Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New York and New Jersey.

### II.   Defendants

10.     Defendant Fish Medical is a New York professional medical corporation with its principal place of business in New York. Fish Medical was formed in New York on June 10, 1999. Fish Medical is purportedly owned by Fish and was used, along with Complete Express, as a vehicle to submit fraudulent billing to GEICO and other insurers.

11.     Defendant Complete Express is a New York professional medical corporation with its principal place of business in New York. Complete Express was formed in New York on April 13, 2018. Complete Express is purportedly owned by Fish and was used, along with Fish Medical, as a vehicle to submit fraudulent billing to GEICO and other insurers.

12.     Defendant Fish resides in and is a citizen of Florida. Fish was licensed to practice medicine in New York on December 7, 1995, purported to own Fish Medical and Complete Express.

13.     Fish is a pediatrician by training, and was, at all relevant times, not qualified to perform or to supervise the various cardiovascular and neurological services purportedly provided to Insureds and billed to GEICO through Fish Medical and Complete Express.

<u>JURISDICTION AND VENUE</u>

14.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

15.     Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 <u>et</u> <u>seq.</u> (the Racketeer Influenced and Corrupt Organizations ["RICO"] Act) because they arise under the laws of the United States.

16.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

17.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

<u>ALLEGATIONS COMMON TO ALL CLAIMS</u>

18.     GEICO underwrites automobile insurance in New York and New Jersey.

**III.     Pertinent New York Law Governing No-Fault Insurance Reimbursement**

19.     New York's no-fault insurance laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the health care services that they need.

20.     Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.), automobile insurers are required to provide no-fault insurance ("Personal Injury Protection" or "PIP") benefits ("PIP Benefits") to Insureds.

21.     In New York, PIP Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for healthcare goods and services, including chiropractic services.

22.     In New York, an Insured can assign his/her right to PIP Benefits to health care goods and services providers in exchange for those services.

23.     In New York, pursuant to a duly executed assignment, a health care provider may submit claims directly to an insurance company and receive payment for medically necessary services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3").

24.     In the alternative, in New York a healthcare services provider may submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 form").

25.     Pursuant to the New York no-fault insurance laws, healthcare services providers are not eligible to bill for or to collect PIP Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

26.     For instance, the implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet <u>any</u> applicable New York State or local licensing requirement necessary to perform such service in New York or meet <u>any</u> applicable licensing requirement necessary to perform such service in any other state in which such service is performed.

(Emphasis added).

27.     New York law prohibits licensed healthcare services providers, including chiropractors and physicians, from paying or accepting kickbacks in exchange for patient referrals. <u>See</u>, <u>e.g.</u>, New York Education Law §§ 6509-a; 6531.

28.     New York law prohibits licensed healthcare services providers, including chiropractors and physicians, from referring patients to healthcare practices in which they have an ownership or investment interest unless: (i) the ownership or investment interest is disclosed to the patient; and (ii) the disclosure informs the patient of his or her "right to utilize a specifically identified alternative health care provider if any such alternative is reasonably available".  <u>See</u> New York Public Health Law § 238-d.

29.     What is more, with limited exceptions that are not applicable here, New York law prohibits licensed healthcare services providers, including chiropractors and physicians, from referring patients for electrodiagnostic testing to healthcare practices in which they have an ownership interest, whether or not the healthcare services providers disclose their ownership interest to the patient. <u>See</u> New York Public Health Law § 238-a.

30.     Therefore, under the New York no-fault insurance laws, a healthcare services provider is not eligible to receive PIP Benefits if it is fraudulently licensed, if it pays or receives unlawful kickbacks in exchange for patient referrals, or if it engages in illegal self-referrals.

31.     In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005), In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005) and Andrew Carothers, M.D., P.C. v. Progressive Ins. Co., 33 N.Y.3d 389 (2019), the New York Court of Appeals made clear that healthcare providers that fail to comply with material licensing requirements are ineligible to collect No-Fault Benefits, and that insurers may look beyond a facially-valid license to determine whether there was a failure to abide by state and local law.

32.     Pursuant to the New York no-fault insurance laws, only healthcare services providers in possession of a direct assignment of benefits are entitled to bill for and collect PIP Benefits. There is both a statutory and regulatory prohibition against payment of PIP Benefits to anyone other than the patient or his/her healthcare services provider. The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.11, states – in pertinent part – as follows:

> An insurer shall pay benefits for any element of loss … directly to the applicant or ... upon assignment by the applicant ... shall pay benefits directly to providers of healthcare services as covered under section five thousand one hundred two (a)(1) of the Insurance Law …

33.     Accordingly, for a healthcare services provider to be eligible to bill for and to collect charges from an insurer for healthcare services pursuant to New York Insurance Law § 5102(a), it must be the actual provider of the services. Under the New York no-fault insurance laws, a healthcare services provider is not eligible to bill for services, or to collect for those services from an insurer, where the services were rendered by persons who were not employees of the healthcare services provider, such as independent contractors.

34.     In New York, claims for PIP Benefits are governed by the New York Workers' Compensation Fee Schedule (the "NY Fee Schedule")

35.     When a healthcare services provider submits a claim for PIP Benefits using the current procedural terminology ("CPT") codes set forth in the NY Fee Schedule, it represents that: (i) the service described by the specific CPT code that is used was performed in a competent manner in accordance with applicable laws and regulations; (ii) the service described by the specific CPT code that is used was reasonable and medically necessary; and (iii) the service and the attendant fee were not excessive.

36.     Pursuant to New York Insurance Law § 403, the NF-3s and HCFA-1500 forms submitted by a healthcare services provider to GEICO, and to all other automobile insurers, must be verified by the health care provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

### III.     The Defendants' Fraudulent Scheme

37.     Beginning in 2020, and continuing through the present day, the Defendants masterminded and implemented a complex fraudulent scheme in which they billed GEICO and other automobile insurers hundreds of thousands of dollars for medically unnecessary, illusory, and otherwise non-reimbursable services.

#### A.     The Multidisciplinary Clinics and Kickbacks

38.     Fish, Fish Medical, and Complete Express did not advertise or market their services to the general public, did not maintain stand-alone practices, and were not the owners of or leaseholders of the real property from which they purported to provide the Fraudulent Services.

39.     Instead, Fish Medical and Complete Express operated on an itinerant basis from several multidisciplinary clinics located throughout the New York area (the "Clinics") that

purported to provide treatment to patients with no-fault insurance, including but not limited to Clinics at the following locations:

(i)      152-80 Rockaway Boulevard, Jamaica, New York

(ii)     1786 Flatbush Avenue, Brooklyn, New York

(iii)    3027 Avenue V, Brooklyn, New York

(iv)    3041 Avenue U, Brooklyn, New York

(v)     632 Utica Avenue, Brooklyn, New York

40.     Though ostensibly organized to provide a range of healthcare services to Insureds at individual locations, these Clinics in actuality were organized to supply convenient, one-stop shops for no-fault insurance fraud.

41.     Fish, Fish Medical, and Complete Express gained access to the Clinics by paying kickbacks to other healthcare services providers (the "Referring Providers") and unlicensed laypersons who operated from the Clinics and controlled access to the Clinics.

42.     The kickbacks to the Clinics were disguised as ostensibly legitimate fees to "lease" space or personnel at the Clinics. In fact, these were "pay-to-play" arrangements that caused the Referring Providers at the Clinics to provide access to Insureds and to refer the Insureds to the Defendants for the Fraudulent Services without regard for the medical necessity of any of the Fraudulent Services.   To the extent that the Defendants attempted to disguise the payments as rent or for other services, the fact that the payments constituted kickbacks in exchange for patient referrals is demonstrated by the fact that the payments were far in excess of the fair market value of the putative leaseholds or other services allegedly provided.

43.     In exchange for these kickbacks from Fish, Fish Medical, and Complete Express, the Referring Providers and unlicensed laypersons automatically referred Insureds to the

Defendants for the medically unnecessary Fraudulent Services, regardless of the Insureds' individual circumstances or presentation.

**B.    The Defendants' Fraudulent Treatment and Billing Protocol**

44.    Virtually all the Insureds whom the Defendants purported to treat were involved in relatively minor, "fender-bender" accidents, to the extent that they were involved in any actual accidents at all. Concomitantly, virtually none of the Insureds whom the Defendants purported to treat suffered from any significant injuries or health problems as a result of the relatively minor accidents they experienced or purported to experience.

45.    Even so, the Defendants purported to subject virtually every Insured to a substantially identical, medically unnecessary course of "treatment" that was provided pursuant to a predetermined, fraudulent protocol designed to maximize the billing that they could submit through Fish Medical and Complete Express to insurers, including GEICO, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to it.

46.    The Defendants purported to provide their predetermined fraudulent treatment protocol to Insureds without regard for the Insureds' individual symptoms, presentation, or – in most cases – the total absence of any actual medical problems arising from any actual automobile accidents.

47.    Each step in the Defendants' fraudulent treatment protocol was designed to falsely reinforce the rationale for the previous step and provide a false justification for the subsequent step, and thereby permit the Defendants to generate and falsely justify the maximum amount of fraudulent no-fault billing for each Insured.

48.    No legitimate physician or other licensed healthcare provider or professional corporation would permit the fraudulent treatment and billing protocol described below to proceed under his or her auspices.

49.     The Defendants permitted the fraudulent treatment and billing protocol described below to proceed under their auspices because the Defendants sought to profit from the fraudulent billing submitted to GEICO and other insurers.

**1.      The Fraudulent Charges for Cardiopulmonary Exercise Testing**

50.     The Defendants purported to subject many Insureds to medically unnecessary cardiopulmonary exercise testing ("Exercise Testing/Tests").

51.     The charges for Exercising Testing were fraudulent in that the Exercise Tests were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to the kickbacks the Defendants paid that allowed the Defendants access to the Clinics' patients.

52.     The charges for Exercising Testing were also fraudulent in that the Exercise Tests, in addition to being medically unnecessary, had no plausible connection to the injuries purportedly suffered by Insureds as a result of their motor vehicle accidents.

53.     Fish, Fish Medical, and Complete Express systemically billed the Exercise Testing to GEICO using CPT codes 94621 and 94375, which generally resulted in charges of $533.57 for each round of Exercise Testing they purported to provide.

**a.   Legitimate Uses for Exercise Testing**

54.     Cardiopulmonary exercise testing i.e., Exercise Testing, is a comprehensive exercise test with a number of component tests, including measurements of minute ventilation, $CO_2$ production, $O_2$ uptake, and electrocardiographic recordings. Exercise Testing is a specialized type of stress test designed to measure a patient's functional capacity.

55.     Exercise Testing is generally considered appropriate to:

(i)      determine the cause of unexplained shortness of breath;

(ii)     assess exercise capacity; or

(iii)    assess a patient's risk for a planned surgical procedure.

56.    In patients with known heart or lung disease, Exercise Testing may be appropriate in order to:

(i)    assess the severity of respiratory disease e.g., chronic obstructive lung disease, pulmonary vascular disease, or cystic fibrosis;

(ii)    determine to what extent a patient's exercise limitations are due to heart or lung involvement in patients with both heart and lung disease;

(iii)    define a patient's level of impairment or disability in order to guide rehabilitation program;

(iv)    assess response to various treatments or medications; or

(v)    assess whether treatments like heart transplantation should be considered to help with congestive heart failure.

57.    Exercise Testing is inappropriate for patients with any musculoskeletal conditions that prevent a person from walking or running on a treadmill or pedaling a stationary bicycle.

**b.  The Defendants' Fraudulent Exercise Testing Charges**

58.    Fish, Fish Medical, and Complete Express did not perform independent evaluations on Insureds to determine if the Exercise Testing was medically necessary.

59.    Instead, the Defendants performed the Exercise Testing pursuant to referrals issued by the Referring Providers as part of a predetermined protocol.

60.    To the extent the Referring Providers conducted medical examinations that assessed the Insureds' cardiovascular or pulmonary symptoms, virtually none of the Insureds who received Exercise Testing from the Provider Defendants reported shortness of breath or any other symptoms warranting Exercise Testing in the examination reports that preceded the Exercise Testing.

61.     Moreover, none of the Insureds who received Exercise Testing reported cardiovascular or pulmonary symptoms warranting Exercise Testing that plausibly resulted from their respective motor vehicle accidents.

62.     In keeping with the predetermined nature of the Exercise Testing purportedly provided to Insureds, in many instances the Referring Provider was a chiropractor who could not legitimately, by training or qualification, assess the need or refer patients for Exercise Testing.

63.     In even more egregious cases, the patient histories and examinations documented in the Referring Providers' examination reports directly contradicted the need for the Exercise Testing; nevertheless, the Defendants subjected the Insureds to medically unnecessary Exercise Testing.

64.     For example:

(i)     On September 11, 2020, an Insured named JSA was purportedly involved in a motor vehicle accident. On September 30, 2020, JSA sought treatment with Apex Medical, P.C. and Arkam Rehman, M.D. ("Rehman") at the Clinic located at 3027 Avenue V, Brooklyn, New York. At that visit, Rehman did not document any shortness of breath or any other symptoms causally related to the motor vehicle accident and justifying a referral for Exercise Testing. Nevertheless, on September 28, 2020, JSA was subjected to Exercise Testing by Fish Medical pursuant to a referral purportedly from Rehman.

(ii)     On September 3, 2020, an Insured named CN was purportedly involved in a motor vehicle accident. On September 14, 2020, CN sought treatment with Able Chiropractic P.C. and Edmund Caribelli, D.C. ("Caribelli") at the Clinic located at 632 Utica Avenue, Brooklyn, New York. At that visit, Caribelli did not document any shortness of breath or any other symptoms causally related to the motor vehicle accident and justifying a referral for Exercise Testing. Nevertheless, on September 21, 2020, CN was subjected to Exercise Testing by Fish Medical pursuant to a referral purportedly from Caribelli.

(iii)     On September 3, 2020, an Insured named NW was purportedly involved in a motor vehicle accident. On September 14, 2020, NW sought treatment with Able Chiropractic P.C. and Caribelli at the Clinic located at 632 Utica Avenue, Brooklyn, New York. At that visit, Caribelli did not document any shortness of breath or any other symptoms causally related to the motor

vehicle accident and justifying a referral for Exercise Testing. Nevertheless, on September 21, 2020, NW was subjected to Exercise Testing by Fish Medical pursuant to a referral purportedly from Caribelli.

(iv)     On November 13, 2020, an Insured named MR was purportedly involved in a motor vehicle accident. On December 14, 2020, MR sought treatment with Apex Medical, P.C. and Rehman at the Clinic located at 3027 Avenue V, Brooklyn, New York. At that visit, Rehman did not document any shortness of breath or any other symptoms causally related to the motor vehicle accident and justifying a referral for Exercise Testing. Nevertheless, on December 30, 2020, MR was subjected to Exercise Testing by Fish Medical pursuant to a referral purportedly from Rehman.

(v)      On September 25, 2020, an Insured named CG was purportedly involved in a motor vehicle accident. On October 1, 2020, CG sought treatment with Able Chiropractic P.C. and Caribelli at the Clinic located at 632 Utica Avenue, Brooklyn, New York. At that visit, Caribelli did not document any shortness of breath or any other symptoms causally related to the motor vehicle accident and justifying a referral for Exercise Testing. Nevertheless, on October 14, 2020, CG was subjected to Exercise Testing by Fish Medical pursuant to a referral purportedly from Caribelli.

(vi)     On November 8, 2019, an Insured named MP was purportedly involved in a motor vehicle accident. On April 28, 2020, MP sought treatment with Able Chiropractic P.C. and Caribelli at the Clinic located at 632 Utica Avenue, Brooklyn, New York. At that visit, Caribelli did not document any shortness of breath or any other symptoms causally related to the motor vehicle accident and justifying a referral for Exercise Testing. Nevertheless, on April 28, 2020, that same day, MP was subjected to Exercise Testing by Complete Express pursuant to a referral purportedly from Caribelli.

(vii)    On May 12, 2020, an Insured named MR was purportedly involved in a motor vehicle accident. On June 8, 2020, MR sought treatment with Able Chiropractic P.C. and Caribelli at the Clinic located at 632 Utica Avenue, Brooklyn, New York. At that visit, Caribelli did not document any shortness of breath or any other symptoms causally related to the motor vehicle accident and justifying a referral for Exercise Testing. Nevertheless, on June 29, 2020, MR was subjected to Exercise Testing by Complete Express pursuant to a referral purportedly from Caribelli.

(viii)   On July 25, 2020, an Insured named ML was purportedly involved in a motor vehicle accident. On August 20, 2020, ML sought treatment with Apex Medical, P.C. and Rehman at the Clinic located at 3027 Avenue V, Brooklyn, New York. At that visit, Rehman did not document any shortness of breath or any other symptoms causally related to the motor vehicle accident and justifying a referral for Exercise Testing. Nevertheless, on

September 14, 2020, ML was subjected to Exercise Testing by Complete Express pursuant to a referral purportedly from Rehman.

(ix)    On July 31, 2020, an Insured named LL was purportedly involved in a motor vehicle accident. On August 4, 2020, LL sought treatment with Able Chiropractic P.C. and Caribelli at the Clinic located at 632 Utica Avenue, Brooklyn, New York. At that visit, Caribelli did not document any shortness of breath or any other symptoms causally related to the motor vehicle accident and justifying a referral for Exercise Testing. Nevertheless, on August 18, 2020, LL was subjected to Exercise Testing by Complete Express pursuant to a referral purportedly from Caribelli.

(x)     On April 2, 2020, an Insured named ML was purportedly involved in a motor vehicle accident. On May 11, 2020, ML sought treatment with Able Chiropractic P.C. and Caribelli at the Clinic located at 632 Utica Avenue, Brooklyn, New York. At that visit, Caribelli did not document any shortness of breath or any other symptoms causally related to the motor vehicle accident and justifying a referral for Exercise Testing. Nevertheless, on May 5, 2020, ML was subjected to Exercise Testing by Complete Express pursuant to a referral purportedly from Caribelli.

65.    These are only representative examples.

66.    In virtually all the claims identified in Exhibits "1" and "2", the Insureds who received Exercise Testing with the Provider Defendants did so despite not exhibiting any shortness of breath or any other cardiopulmonary symptoms, much less symptoms plausibly related to the Insureds' motor vehicle accidents.

67.    Although virtually none of the Insureds who were purportedly subjected to Exercise Testing displayed symptoms warranting the testing, the Defendants submitted, or caused to be submitted, thousands of dollars in bills for Exercise Testing to GEICO, as part of the Fraudulent Services.

### c.  The Lack of Causality Between Insureds' Motor Vehicles Accidents and Symptoms Purportedly Warranting Exercise Testing

68.    New York No-Fault insurance is designed to provide reimbursement for medically necessary expenses on account of personal injuries arising out of the use or operation of a motor vehicle. See N.Y. Ins. Law § 5102.

16

69.     There are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in an automobile accident. These variables include, but are not limited to, an individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact.

70.     It is entirely implausible that an Insured, as a result of an automobile accident, would require Exercise Testing to treat a condition causally related to that automobile accident.

71.     It is entirely implausible – to the point of absurdity – that multiple Insureds involved in the same automobile accident would require Exercise Testing at or about the same time.

72.     Even so, and in keeping with the fact that the Exercise Testing purportedly performed by the Defendants was not medically necessary, was not causally related to the Insureds' motor vehicle accident and was performed pursuant to predetermined protocols to maximize profits, the Defendants routinely provided Exercise Testing to multiple Insureds involved in the same accident at or about the same time.

73.     Fish Medical and Complete Express routinely provided Exercise Testing to multiple Insureds involved in the same accident at or about the same time as follows:

(i)     On September 3, 2020, two insureds – NW and CN - were involved in the same automobile accident. Thereafter, NW and CN both - incredibly – were purportedly subjected to Exercise Testing by Fish Medical on September 21, 2020.

(ii)    On November 8, 2020, two insureds – BC and BC - were involved in the same automobile accident. Thereafter, BC and BC both - incredibly – were purportedly subjected to Exercise Testing by Fish Medical on November 30, 2020.

(iii)   On March 26, 2021, two insureds – CS and LM - were involved in the same automobile accident. Thereafter, CS and LM both - incredibly – were purportedly subjected to Exercise Testing by Fish Medical on April 27, 2021.

(iv)    On October 19, 2020, two insureds – WD and CB - were involved in the same automobile accident. Thereafter, WN and CB both - incredibly – were

17

purportedly subjected to Exercise Testing by Fish Medical on October 28, 2020.

(v)     On August 15, 2020, three insureds – VW, UM, and CM - were involved in the same automobile accident. Thereafter, VW, UM, and CM all - incredibly – were purportedly subjected to Exercise Testing by Fish Medical on October 19, 2020.

(vi)    On May 12, 2020, two insureds – MR and DR - were involved in the same automobile accident. Thereafter, MR and DR both - incredibly – were purportedly subjected to Exercise Testing by Complete Express on May 19, 2020.

(vii)   On July 31, 2020, two insureds – LG and L - were involved in the same automobile accident. Thereafter, LG and LL both - incredibly – were purportedly subjected to Exercise Testing by Complete Express on August 19, 2020.

(viii)  On June 16, 2020, two insureds – BB and KK - were involved in the same automobile accident. Thereafter, BB and KK both - incredibly – were purportedly subjected to Exercise Testing by Complete Express on July 8, 2020.

(ix)    On August 13, 2020, two insureds – BO and YF - were involved in the same automobile accident. Thereafter, BO and YF both - incredibly – were purportedly subjected to Exercise Testing by Complete Express on August 19, 2020.

(x)     On June 5, 2020, two insureds – White and MA - were involved in the same automobile accident. Thereafter, IW and MA both - incredibly – were purportedly subjected to Exercise Testing by Complete Express on June 10, 2020.

74.     These are only representative examples.

75.     In many of the claims identified in Exhibits "1" and "2", two or more Insureds involved in the same underlying accident received Exercise Testing from the Defendants at or about the same time, despite the fact that the Insureds were differently situated and reported symptoms that were not plausibly related to their motor vehicle accidents.

76.     In keeping with the fact that the Exercise Tests that supposedly were provided by the Defendants were medically unnecessary, upon information and belief, no physician or

healthcare provider associated with the Defendants properly prepared the Insureds for the tests or conducted any sort of pre-test evaluation or screening. This, in turn, rendered the data that the Defendants purported to obtain from the tests unreliable and useless.

77.     Because the Defendants knew the Exercise Tests were unreliable and useless, the data results that the Defendants purported to obtain from the tests was not incorporated into any Insured's treatment plan.

78.     In keeping with the fact that the Exercise Tests were medically unnecessary and administered pursuant to a predetermined fraudulent treatment protocol, (i) virtually all the Exercise Test reports failed to indicate why the Exercise Testing was being done in the first place, and (ii) the Exercise Testing Reports virtually never indicated that the Insureds' symptoms were related to their respective motor vehicle accidents.

79.     It is clear the Exercise Tests were purportedly rendered and then billed to GEICO pursuant to the Defendants' fraudulent treatment and billing protocols designed solely to financially enrich the Defendants, rather than to benefit any of the Insureds who supposedly were subjected to the tests.

**2.  The Fraudulent Charges for Cardiac and Vascular Diagnostic Imaging**

80.     As part-and-parcel of their fraudulent scheme, the Defendants purported to subject many Insureds to medically unnecessary cardiac and vascular imaging ("Cardiovascular Imaging").

81.     The charges for the Cardiovascular Imaging were fraudulent in that the imaging was medically unnecessary and was performed – to the extent performed at all – pursuant to the kickbacks the Defendants paid that allowed the Defendants access to the Clinics' patients.

82. The charges for the Cardiovascular Imaging were also fraudulent in that the imaging, in addition to being medically unnecessary, had no plausible connection to the injuries purportedly suffered by Insureds as a result of their motor vehicle accidents.

83. Fish, Fish Medical, and Complete Express billed the Cardiovascular Imaging to GEICO using CPT codes 93880, 93931, 93923, 93306, 93975, 93930, and/or 93925, generally resulting in charges between $200.00 and 2,500.00 for each round of Cardiovascular Imaging they purported to provide.

### a. Legitimate Uses for Cardiovascular Imaging

84. Cardiovascular Imaging, as employed by the Defendants, encompasses numerous invasive and non-invasive tests designed to evaluate, diagnose, and aid in the treatment of heart disease and conditions involving abnormal blood flow, including atherosclerosis, aneurysm, varicose veins, or blood clots.

85. For example, an echocardiogram may be medically necessary to assist in the diagnosis and treatment of a heart valve disorder.

86. Cardiovascular imaging is not typically – if ever – required to diagnosis or aid in the treatment of injuries resulting from motor vehicle accidents.

### b. The Defendants' Fraudulent Cardiovascular Imaging Charges

87. Fish, Fish Medical, and Complete Express did not perform independent evaluations on Insureds to determine if the Cardiovascular Imaging was medically necessary.

88. Instead, the Defendants performed the Cardiovascular Imaging pursuant to referrals issued by the Referring Providers as part of a predetermined protocol.

89. To the extent the Referring Providers conducted medical examinations that assessed the Insureds' cardiovascular symptoms, virtually none of the Insureds who received

Cardiovascular Imaging from the Provider Defendants reported any symptoms medically justifying the Cardiovascular Imaging.

90. In fact, prior to being subjected to the Defendants' protocol of medically unnecessary Cardiovascular Imaging, Insureds – in virtually every instance – never even saw a cardiologist.

91. Moreover, none of the Insureds who received the Cardiovascular Imaging reported any cardiovascular symptoms warranting the imaging, much less symptoms that plausibly resulted from their respective motor vehicle accidents.

92. In keeping with the predetermined nature of the Cardiovascular Imaging purportedly provided to Insureds, in many instances the Referring Provider was a chiropractor who could not legitimately, by training or qualification, assess the need or refer patients for Cardiovascular Imaging.

93. In even more egregious cases, the diagnoses and test results documented in the Referring Providers' examination reports directly contradicted the need for the Cardiovascular Imaging; nevertheless, the Defendants routinely subjected Insureds to medically unnecessary Cardiovascular Imaging.

94. For example:

    (i)    On September 11, 2020, an Insured named JSA was purportedly involved in a motor vehicle accident. On September 30, 2020, JSA sought treatment with Apex Medical, P.C. and Rehman at the Clinic located at 3027 Avenue V, Brooklyn, New York. At that visit, Rehman did not document any chest pain, dizziness, or any symptoms causally related to the motor vehicle accident and justifying a referral for Cardiovascular Imaging. Nevertheless, on September 28, 2020, JSA was subjected to a bilateral extremity arterial assessment using CPT code 93923 by Fish Medical pursuant to a referral purportedly from Rehman. On October 12, 2020, JSA was subjected to a bilateral duplex scan of extracranial arteries using CPT code 93880, a duplex scan of upper extremity arteries using CPT code 93931, and an echocardiogram using CPT code 93306 by Fish Medical all pursuant to a

referral purportedly from Rehman. On November 2, 2020, JSA was subjected to a bilateral duplex scan of lower extremity arteries using CPT code 93925 and a bilateral duplex scan of upper extremity arteries using CPT code 93930 by Fish Medical pursuant to referral purportedly from Rehman. The medically unnecessary Cardiovascular Imaging resulted in charges of $2,159.31.

(ii)     On September 3, 2020, an Insured named CN was purportedly involved in a motor vehicle accident. On September 14, 2020, CN sought treatment with Able Chiropractic P.C. and Edmund Caribelli, D.C. ("Caribelli") at the Clinic located at 632 Utica Avenue, Brooklyn, New York. At that visit, Caribelli did not document any chest pain, dizziness, or any symptoms causally related to the motor vehicle accident and justifying a referral for Cardiovascular Imaging. Nevertheless, on September 21, 2020, CN was subjected to a bilateral extremity arterial assessment using CPT code 93923 by Fish Medical pursuant to a referral purportedly from Caribelli, resulting in charges of $200.00.

(iii)    On September 3, 2020, an Insured named NW was purportedly involved in a motor vehicle accident. On September 14, 2020, NW sought treatment with Able Chiropractic P.C. and Caribelli at the Clinic located at 632 Utica Avenue, Brooklyn, New York. At that visit, Caribelli did not document any chest pain, dizziness, or any symptoms causally related to the motor vehicle accident and justifying a referral for Cardiovascular Imaging. Nevertheless, on September 21, 2020, NW was subjected to a bilateral extremity arterial assessment using CPT code 93923 by Fish Medical pursuant to a referral purportedly from Caribelli, resulting in charges of $200.00.

(iv)    On November 13, 2020, an Insured named MR was purportedly involved in a motor vehicle accident. On December 14, 2020, MR sought treatment with Apex Medical, P.C. and Rehman at the Clinic located at 3027 Avenue V, Brooklyn, New York. At that visit, Rehman did not document any chest pain, dizziness, or any symptoms causally related to the motor vehicle accident and justifying a referral for Cardiovascular Imaging. Nevertheless, on December 30, 2020, MR was subjected to a bilateral extremity arterial assessment using CPT code 93923 by Fish Medical pursuant to a referral purportedly from Rehman, resulting in charges of $200.00.

(v)     On September 25, 2020, an Insured named CG was purportedly involved in a motor vehicle accident. On October 1, 2020, CG sought treatment with Able Chiropractic P.C. and Caribelli at the Clinic located at 632 Utica Avenue, Brooklyn, New York. At that visit, Caribelli did not document any chest pain, dizziness, or any symptoms causally related to the motor vehicle accident and justifying a referral for Cardiovascular Imaging. Nevertheless, on October 14, 2020, CG was subjected to a bilateral extremity arterial assessment using CPT code 93923 by Fish Medical pursuant to a referral purportedly from Rehman, resulting in charges of $200.00.

(vi)     On November 8, 2019, an Insured named MP was purportedly involved in a motor vehicle accident. On April 28, 2020, MP sought treatment with Able Chiropractic P.C. and Caribelli at the Clinic located at 632 Utica Avenue, Brooklyn, New York. At that visit, Caribelli did not document any chest pain, dizziness, or any symptoms causally related to the motor vehicle accident and justifying a referral for Cardiovascular Imaging. Nevertheless, on April 28, 2020, that same day, MP was subjected to a bilateral extremity arterial assessment using CPT code 93923 by Complete Express pursuant to a referral purportedly from Caribelli, resulting in charges of $200.00.

(vii)    On May 12, 2020, an Insured named MR was purportedly involved in a motor vehicle accident. On June 8, 2020, MR sought treatment with Able Chiropractic P.C. and Caribelli at the Clinic located at 632 Utica Avenue, Brooklyn, New York. At that visit, Caribelli did not document any chest pain, dizziness, or any symptoms causally related to the motor vehicle accident and justifying a referral for Cardiovascular Imaging. Nevertheless, on May 190, 2020, was subjected to a bilateral extremity arterial assessment using CPT code 93923 by Complete Express pursuant to a referral purportedly from Caribelli, resulting in charges of $200.00.

(viii)   On July 25, 2020, an Insured named ML was purportedly involved in a motor vehicle accident. On August 20, 2020, ML sought treatment with Apex Medical, P.C. and Rehman at the Clinic located at 3027 Avenue V, Brooklyn, New York. At that visit, Rehman did not document any chest pain, dizziness, or any symptoms causally related to the motor vehicle accident and justifying a referral for Cardiovascular Imaging. Nevertheless, on August 19, 2020, ML was subjected to a bilateral duplex scan of extracranial arteries using CPT code 93880 and a duplex scan of upper extremity arteries using CPT code 93931 by Complete Express pursuant to a referral purportedly from Rehman. On September 14, 2020, ML was subjected to a bilateral extremity arterial assessment using CPT code 93923 by Complete Express pursuant to a referral purportedly from Rehman. The medically unnecessary Cardiovascular Imaging resulted in charges of $718.66.

(ix)     On July 31, 2020, an Insured named LL was purportedly involved in a motor vehicle accident. On August 4, 2020, LL sought treatment with Able Chiropractic P.C. and Caribelli at the Clinic located at 632 Utica Avenue, Brooklyn, New York. At that visit, Caribelli did not document any chest pain, dizziness, or any symptoms causally related to the motor vehicle accident and justifying a referral for Cardiovascular Imaging. Nevertheless, on August 12, 2020, LL was subjected to a bilateral duplex scan of upper extremity arteries using CPT code 93930 and a duplex scan of arterial inflow/venous outflow of abdominal, pelvic, scrotal contents, and/or retroperitoneal organs using CPT code 93975 by Complete Express, pursuant to a referral purportedly from Caribelli. The medically unnecessary Cardiovascular Imaging resulted in charges of $805.87.

23

(x)     On April 2, 2020, an Insured named ML was purportedly involved in a motor vehicle accident. On May 11, 2020, ML sought treatment with Able Chiropractic P.C. and Caribelli at the Clinic located at 632 Utica Avenue, Brooklyn, New York. At that visit, Caribelli did not document any chest pain, dizziness, or any symptoms causally related to the motor vehicle accident and justifying a referral for Cardiovascular Imaging. Nevertheless, on April 30, 2020, ML was subjected a bilateral duplex scan of extracranial arteries using CPT code 93880, a duplex scan of upper extremity arteries using CPT code 93931, an echocardiogram using CPT code 93306, and a duplex scan of arterial inflow/venous outflow of abdominal, pelvic, scrotal contents, and/or retroperitoneal organs using CPT code 93975 by Complete Express pursuant to a referral purportedly from Caribelli. On May 5, 2020, ML was subjected to a bilateral extremity arterial assessment using CPT code 93923 by Complete Express pursuant to a referral purportedly from Caribelli. The medically unnecessary Cardiovascular Imaging resulted in charges of $1,600.13.

95.     These are only representative examples.

96.     In virtually all of the claims identified in Exhibits "1" and "2", the Insureds who received Cardiovascular Imaging with the Provider Defendants did so despite not exhibiting any chest pain, dizziness, or any other cardiovascular symptoms, much less symptoms plausibly related to the Insureds' motor vehicle accidents.

97.     Although virtually none of the Insureds who received Cardiovascular Imaging displayed symptoms warranting the testing, the Defendants submitted, or caused to be submitted, thousands of dollars in bills for Cardiovascular Imaging to GEICO, as part of the Fraudulent Services.

c.  **The Lack of Causality Between Insureds' Motor Vehicles Accidents and Symptoms Purportedly Warranting Cardiovascular Imaging**

98.     Outside an emergency room context, it is entirely implausible that an Insured, because of an automobile accident, would require Cardiovascular Imaging to treat a condition causally related to that automobile accident.

99.     Outside an emergency room context, it is entirely implausible – to the point of absurdity – that multiple Insureds involved in the same automobile accident would require Cardiovascular Imaging at or about the same time.

100.     Even so, and in keeping with the fact that the Cardiovascular Imaging purportedly performed by the Defendants was not medically necessary and was performed pursuant to predetermined protocols to maximize profits, the Defendants routinely provided Cardiovascular Imaging to multiple Insureds involved in the same accident at or about the same time.

101.     Fish Medical and Complete Express routinely provided Cardiovascular Imaging to multiple Insureds involved in the same accident at or about the same time as follows:

(i)     On September 3, 2020, two insureds – NW and CN - were involved in the same automobile accident. Thereafter, NW and CN both - incredibly – were purportedly subjected to Cardiovascular Imaging by Fish Medical on September 21, 2020.

(ii)     On November 8, 2020, two insureds – BC and BC - were involved in the same automobile accident. Thereafter, BC and BC both - incredibly – were purportedly subjected to Cardiovascular Imaging by Fish Medical on November 30, 2020.

(iii)     On March 26, 2021, two insureds – CS and LM - were involved in the same automobile accident. Thereafter, CS and LM both - incredibly – were purportedly subjected to Cardiovascular Imaging by Fish Medical on April 27, 2021.

(iv)     On October 19, 2020, three insureds – WN, SB, and CB - were involved in the same automobile accident. Thereafter, WN, SB, and CB all - incredibly – were purportedly subjected to Cardiovascular Imaging by Fish Medical on October 28, 2020.

(v)     On August 15, 2020, three insureds – VW and UM - were involved in the same automobile accident. Thereafter, VW and UM both - incredibly – were purportedly subjected to Cardiovascular Imaging by Fish Medical on October 19, 2020.

(vi)     On May 12, 2020, two insureds – MR and DR - were involved in the same automobile accident. Thereafter, MR and DR both - incredibly – were purportedly subjected to Cardiovascular Imaging by Complete Express on May 19, 2020.

(vii)   On July 31, 2020, two insureds – LG and LL - were involved in the same automobile accident. Thereafter, LG and LL both - incredibly – were purportedly subjected to Cardiovascular Imaging by Complete Express on August 19, 2020.

(viii)   On June 16, 2020, two insureds – BB and KK - were involved in the same automobile accident. Thereafter, BB and KK both - incredibly – were purportedly subjected to Cardiovascular Imaging by Complete Express on July 8, 2020.

(ix)   On August 13, 2020, two insureds – BO and YF - were involved in the same automobile accident. Thereafter, BO and YF both - incredibly – were purportedly subjected to Cardiovascular Imaging by Complete Express on August 19, 2020.

(x)   On June 5, 2020, two insureds – IW and MA - were involved in the same automobile accident. Thereafter, IW and MA both - incredibly – were purportedly subjected to Cardiovascular Imaging by Complete Express on June 10, 2020.

102.   These are only representative examples.  In many of the claims identified in Exhibits "1" and "2", two or more Insureds involved in the same underlying accident received Cardiovascular Imaging from the Defendants at or about the same time, despite the fact that the Insureds were differently situated and reported symptoms that were not plausibly related to their motor vehicle accidents.

103.   In keeping with the fact that the Cardiovascular Imaging that supposedly were provided by the Defendants were medically unnecessary, upon information and belief, no physician or healthcare provider associated with the Defendants properly prepared the Insureds for the tests or conducted any sort of pre-test evaluation or screening. This, in turn, rendered the data that the Defendants purported to obtain from the tests unreliable and useless.

104.   Because the Defendants knew the Cardiovascular Imaging was unreliable and useless, the data results that the Defendants purported to obtain from the tests was not incorporated into any Insured's treatment plan.

105.    In keeping with the fact that the Cardiovascular Imaging was medically unnecessary and administered pursuant to a predetermined fraudulent treatment protocol, virtually all the Cardiovascular Imaging reports failed to indicate why the Cardiovascular Imaging was being done in the first place.

106.    In keeping with the lack of causality between the Insureds' purported motor vehicle accidents and the Cardiovascular Imaging, the Cardiovascular Imaging reports virtually never indicated that the Insureds' symptoms were related to their respective motor vehicle accidents.

107.    It is clear the Cardiovascular Imaging was purportedly rendered and then billed to GEICO pursuant to the Defendants' fraudulent treatment and billing protocols designed solely to financially enrich the Defendants, rather than to benefit any of the Insureds who supposedly were subjected to the tests.

### 3.  The Fraudulent Charges for Videonystagmography

108.    The Defendants purported to subject many Insureds to medically unnecessary videonystagmography ("VNG") tests and computerized dynamic posturography ("CDP") tests.

109.    The charges for the VNG  and CDP tests (collectively "VNG/CDP") were fraudulent in that the VNG/CDP tests were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to the kickbacks the Defendants paid that allowed the Defendants access to the Clinics' patients.

110.    Fish Medical billed the VNG/CDP to GEICO using CPT codes 92537, 92540, 92543, 92546, 92547, and 92548 generally resulting in charges of $2,258.37 for each VNGCDP test it purported to provide.

### a. Legitimate Uses for VNG Tests

111.    VNG/CDP tests consist of tests that can be used to determine the cause of a patient's vertigo or balance disorder in cases where there are no readily recognizable contributing factors to the patient's condition.

112.    In other words, VNG/CDP tests are not used to confirm the existence of dizziness or a balance disorder, but rather to identify the origin of the condition in the relatively rare cases where it cannot be determined through an ENT or neurological medical examination. Generally, VNG/CDP tests are employed to determine the source of the generation of vertigo, i.e., the inner ear or brain.

113.    VNG tests record involuntary eye movements, called nystagmus, using video imaging technology. The nystagmus is recorded and analyzed using sophisticated video goggles which are equipped with infrared video cameras.  The patient wears these goggles while being subjected to various stimuli, which duplicates the extraocular movement portion of the physical examination.

114.    There are four main components to VNG testing: (i) the saccade test, which evaluates rapid eye movements between fixation points; (ii) the tracking test, which evaluates movement of the eyes as they pursue a visual target; (iii) the positional test, which measures eye movements associated with positions of the head; and (iv) the caloric test, which measures responses to warm or cold water or air circulated through the ear canal. The cameras record the eye movements and display them on a video/computer screen. This allows the physician to see how the eyes move, which helps the physician assess the patient's vertigo, which in turn helps the physician assess the source of imbalance.

115.    To properly administer a VNG test, the patient must be prepared appropriately. This preparation typically requires 72 hours of abstention from medication (with the exception of heart, high blood pressure and anticonvulsant medications); 24 hours of abstention from stimulants such as caffeine, as well as alcohol; and three hours of food abstention. In addition, patients must be provided with a pre-test history and examination, to determine – among other things – the nature of the problematic symptoms and the patient's eye movements.

116.    VNGCDP tests should not be used as a first-line diagnostic procedure when a patient reports dizziness as the result of automobile accident trauma.  A legitimate diagnostic process for a patient reporting dizziness following an automobile accident should begin with a physical examination, including an ENT and neurological examination, followed by conservative care absent evidence of a more serious condition, e.g., a brain tumor. If the patient does not respond to conservative care, an MRI of the brain may be ordered. If a patient does not respond to conservative care, and the brain MRI is negative, the patient may be evaluated by an ENT or neurologist to determine if VNG/CDP is warranted. Virtually none of the Insureds were referred to the Providers by an ENT or a neurologist, the vast majority did not undergo conservative care prior to undergoing VNG/CDP testing with the Providers, and virtually none received a brain MRI prior to undergoing the VNG/CDP testing with the Providers.

**b.  The Defendants' Fraudulent VNG Test Charges**

117.    Fish Medical and Complete Express did not perform independent evaluations on Insureds to determine if the VNG/CDP testing was medically necessary.

118.    Instead, the Defendants performed the VNG/CDP testing pursuant to referrals issued by the Referring Providers as part of a pre-determined protocol.

119.     To the extent the Referring Providers conducted medical examinations that assessed the Insureds' neurological symptoms, virtually none of the Insureds who received VNG/CDP testing from the Provider Defendants reported experiencing dizziness, imbalance, or vertigo in the examination reports that preceded the VNG/CDP testing.

120.     In even more egregious cases, the patent histories and examinations documented in the Referring Providers' examination reports directly contradicted the need for the VNG/CDP tests, nevertheless the Defendants subjected the Insureds to multiple rounds of testing.

121.     For example:

(i)      On September 11, 2020, an Insured named JSA was purportedly involved in a motor vehicle accident. On September 30, 2020, JSA sought treatment with Apex Medical, P.C. and Arkam Rehman, M.D. ("Rehman") at the Clinic located at 3027 Avenue V, Brooklyn, New York. At that visit, Rehman did not document any dizziness, vertigo, or tinnitus. Nevertheless, on September 28, 2020, JSA underwent VNG/CDP testing by Fish Medical pursuant to a referral purportedly from Rehman.

(ii)     On September 3, 2020, an Insured named CN was purportedly involved in a motor vehicle accident. On September 14, 2020, CN sought treatment with Able Chiropractic P.C. and Edmund Caribelli, D.C. ("Caribelli") at the Clinic located at 632 Utica Avenue, Brooklyn, New York. At that visit, Caribelli did not document any dizziness, vertigo, or tinnitus. Nevertheless, on September 21, 2020, CN underwent VNG/CDP testing by Fish Medical pursuant to a referral purportedly from Caribelli.

(iii)    On September 3, 2020, an Insured named NW was purportedly involved in a motor vehicle accident. On September 14, 2020, NW sought treatment with Able Chiropractic P.C. and Caribelli at the Clinic located at 632 Utica Avenue, Brooklyn, New York. At that visit, Caribelli did not document any dizziness, vertigo, or tinnitus. Nevertheless, on September 21, 2020, NW underwent VNG/CDP testing by Fish Medical pursuant to a referral purportedly from Caribelli.

(iv)     On November 13, 2020, an Insured named MR was purportedly involved in a motor vehicle accident. On December 14, 2020, MR sought treatment with Apex Medical, P.C. and Rehman at the Clinic located at 3027 Avenue V, Brooklyn, New York. At that visit, Rehman did not document any dizziness, vertigo, or tinnitus. Nevertheless, on December 30, 2020, MR underwent VNG/CDP testing by Fish Medical pursuant to a referral purportedly from Rehman.

(v)     On September 25, 2020, an Insured named CG was purportedly involved in a motor vehicle accident. On October 1, 2020, CG sought treatment with Able Chiropractic P.C. and Caribelli at the Clinic located at 632 Utica Avenue, Brooklyn, New York. At that visit, Caribelli did not document any dizziness, vertigo, or tinnitus. Nevertheless, on October 14, 2020, CG underwent VNG/CDP testing by Fish Medical pursuant to a referral purportedly from Caribelli.

(vi)    On November 8, 2019, an Insured named MP was purportedly involved in a motor vehicle accident. On April 28, 2020, MP sought treatment with Able Chiropractic P.C. and Caribelli at the Clinic located at 632 Utica Avenue, Brooklyn, New York. At that visit, Caribelli did not document any dizziness, vertigo, or tinnitus. Nevertheless, on April 28, 2020, that same day, MP underwent VNG/CDP testing by Complete Express pursuant to a referral purportedly from Caribelli.

(vii)   On May 12, 2020, an Insured named MR was purportedly involved in a motor vehicle accident. On June 8, 2020, MR sought treatment with Able Chiropractic P.C. and Caribelli at the Clinic located at 632 Utica Avenue, Brooklyn, New York. At that visit, Caribelli did not document any dizziness, vertigo, or tinnitus. Nevertheless, on May 19, 2020, MR underwent VNG/CDP testing by Complete Express pursuant to a referral purportedly from Caribelli.

(viii)  On July 25, 2020, an Insured named ML was purportedly involved in a motor vehicle accident. On August 20, 2020, ML sought treatment with Apex Medical, P.C. and Rehman at the Clinic located at 3027 Avenue V, Brooklyn, New York. At that visit, Rehman did not document any dizziness, vertigo, or tinnitus. Nevertheless, on September 14, 2020, ML underwent VNG/CDP testing by Complete Express pursuant to a referral purportedly from Rehman.

(ix)    On July 31, 2020, an Insured named LL was purportedly involved in a motor vehicle accident. On August 4, 2020, LL sought treatment with Able Chiropractic P.C. and Caribelli at the Clinic located at 632 Utica Avenue, Brooklyn, New York. At that visit, Caribelli did not document any dizziness, vertigo, or tinnitus. Nevertheless, on August 19, 2020, LL underwent VNG/CDP testing by Complete Express pursuant to a referral purportedly from Caribelli.

(x)     On April 2, 2020, an Insured named ML was purportedly involved in a motor vehicle accident. On May 11, 2020, ML sought treatment with Able Chiropractic P.C. and Caribelli at the Clinic located at 632 Utica Avenue, Brooklyn, New York. At that visit, Caribelli did not document any dizziness, vertigo, or tinnitus. Nevertheless, on May 5, 2020, ML underwent VNG/CDP testing by Complete Express pursuant to a referral purportedly from Caribelli.

122.    These are only representative examples.

123.    In virtually all the claims identified in Exhibits "1" and "2", the Insureds who received VNG/CDP testing with the Provider Defendants did so despite exhibiting no dizziness, vertigo, tinnitus, or gait abnormalities.

124.    Although virtually none of the Insureds who received VNG/CDP displayed symptoms warranting the testing, the Defendants submitted, or caused to be submitted, thousands of dollars in bills for VNG/CDP testing to GEICO, as part of the Fraudulent Services.

125.    Moreover, there are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in an automobile accident. These variables include, but are not limited to, an individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact.

126.    It is extremely improbable – to the point of impossibility – that multiple Insureds involved in the same automobile accident would routinely require VNG/CDP testing at or about the same time.

127.    Even so, and in keeping with the fact that the VNG/CDP testing purportedly performed by the Defendants was not medically necessary and was performed pursuant to predetermined protocols to maximize profits, the Defendants routinely provided VNG/CDP testing to multiple Insureds involved in the same accident at or about the same time.

128.    Fish Medical routinely provided VNG/CDP testing to multiple Insureds involved in the same accident at or about the same time as follows:

>    (i)    On September 3, 2020, two insureds – NW and CN - were involved in the same automobile accident. Thereafter, NW and CN both - incredibly – were purportedly subjected to VNG/CDP testing by Fish Medical on September 21, 2020.

>    (ii)    On November 8, 2020, two insureds – BC and BC - were involved in the same automobile accident. Thereafter, BC and BC both - incredibly – were

purportedly subjected to VNG/CDP testing by Fish Medical on November 30, 2020.

(iii)   On March 26, 2021, two insureds – CS and LM - were involved in the same automobile accident. Thereafter, CS and LM both - incredibly – were purportedly subjected to VNG/CDP testing by Fish Medical on April 27, 2021.

(iv)   On October 19, 2020, three insureds – WN, SB, and CB - were involved in the same automobile accident. Thereafter, WN, SB, and CB all - incredibly – were purportedly subjected to VNG/CDP testing by Fish Medical on October 28, 2020.

(v)   On August 15, 2020, three insureds – VW, UM, and CM - were involved in the same automobile accident. Thereafter, VW, UM, and CM all - incredibly – were purportedly subjected to VNG/CDP testing by Fish Medical on October 19, 2020.

(vi)   On May 12, 2020, two insureds – MR and DR - were involved in the same automobile accident. Thereafter, MR and DR both - incredibly – were purportedly subjected to VNG/CDP testing by Complete Express on May 19, 2020.

(vii)   On July 31, 2020, two insureds – LG and LL - were involved in the same automobile accident. Thereafter, LG and LL both - incredibly – were purportedly subjected to VNG/CDP testing by Complete Express on August 19, 2020.

(viii)   On June 16, 2020, two insureds – BB and KK - were involved in the same automobile accident. Thereafter, BB and KK both - incredibly – were purportedly subjected to VNG/CDP testing by Complete Express on July 8, 2020.

(ix)   On August 13, 2020, two insureds – BO and YF - were involved in the same automobile accident. Thereafter, BO and YF both - incredibly – were purportedly subjected to VNG/CDP testing by Complete Express on August 19, 2020.

(x)   On June 5, 2020, two insureds – IW and MA - were involved in the same automobile accident. Thereafter, IW and MA both - incredibly – were purportedly subjected to VNG/CDP testing by Complete Express on June 10, 2020.

129.   These are only representative examples.

130.    In many of the claims identified in Exhibits "1" and "2", two or more Insureds involved in the same underlying accident received VNG/CDP testing from the Defendants at or about the same time, despite the fact that the Insureds were differently situated.

131.    Even if an Insured reported the existence of some general form of dizziness or balance disorder, the VNG/CDP tests that supposedly were provided by the Defendants were medically unnecessary because the cause of the Insured's dizziness or imbalance could be identified through the physical examinations that the Referring Providers routinely purported to provide, and the patient histories that they purported to take, during every initial examination/consultation and follow-up examination.

132.    Furthermore, because VNG/CDP tests properly are limited to circumstances in which the origin of a patient's vertigo is unclear, there is no legitimate reason to use VNG/CDP tests where – as in the case of every Insured who supposedly received VNG/CDP testing from the Defendants – the dizziness supposedly was caused by an automobile accident.

133.    Indeed, in virtually all the limited instances in which a patient complained of dizziness upon examination, the onset of symptoms was identified as the date of the automobile accident.

134.    In keeping with the fact that the VNG/CDP tests that supposedly were provided by the Defendants were medically unnecessary, upon information and belief no physician or healthcare provider associated with the Defendants properly prepared the Insureds for the tests or conducted any sort of pre-test evaluation or screening. This, in turn, rendered the data that the Defendants purported to obtain from the tests unreliable and useless.

135.    Because the Defendants knew the VNG/CDP tests were unreliable and useless, the data results that the Defendants purported to obtain from the tests was not incorporated into any

Insured's treatment plan. Even when the VNG/CDP tests returned a positive result, the Insureds rarely, if ever, underwent vestibular rehabilitation, balance retraining, or any other therapy to address their putative balance issues.

136.    In further keeping with the fact that the VNG/CDP tests were unreliable and useless, in many instances when the VNG/CDP tests returned inconclusive results, the Insureds did not undergo additional testing to generate conclusive results.

137.    In keeping with the fact that the VNG/CDP tests were medically unnecessary and administered pursuant to a predetermined fraudulent treatment protocol, virtually all the VNG reports contain pre-printed, boilerplate language, stating "patient c/o recurrent episodes of dizziness and headaches" even though virtually none of the patients who treated with the Defendants actually complained of recurrent episodes of dizziness.

138.    In further keeping with the fact that the VNG/CDP tests were unreliable and useless, to the extent the Provider Defendants generated Infrared/Video ENG Reports as a result of the VNG tests, the Infrared/Video ENG Reports virtually always contained the following pre-printed boilerplate test results:

- "The VNG shows no gaze, spontaneous or positional nystagmus. The Dix-Hallpike tests for benign paroxysmal position vertigo (BPPV) were negative for both sides. There is no significant unilateral weakness and directional preponderance. Saccadic eye velocity and accuracy were normal. Visual tracking/pursuit and optokinetic tests were normal and symmetrical. Active head rotation was performed at speeds of 1-3 Hz. for both the vertical and horizontal vestibulo-ocular reflex (VOR). Increased Normative values for gain both horizontally and vertically are 75-125% with horizontal asymmetry within +/- 10%. Both, horizontal and vertical VORs were normal."

- "Summary:
  Tests [sic] results are normal. There is no evidence of significant central or peripheral vestibular dysfunction. If the patient is still experiencing headache and dizziness return for further treatment and evaluation is recommended."

139.    It is clear the VNG/CDP testing was purportedly rendered and then billed to GEICO pursuant to the Defendants' fraudulent treatment and billing protocols designed solely to financially enrich the Defendants, rather than to benefit any of the Insureds who supposedly were subjected to the tests.

### 4.    The Fraudulent Charges for Transcranial Doppler Studies

140.    The Defendants also purported to subject many Insureds to medically unnecessary transcranial doppler ("TCD") testing.

141.    The charges for the TCD testing were fraudulent in that the transcranial doppler tests were medically unnecessary and were performed—to the extent they were performed at all— pursuant to fraudulent treatment protocols and illegal kickback and referral arrangements.

142.    Fish, Fish Medical, and Complete Express then billed the TCD to GEICO using CPT 93886, 93888, and 93890, typically resulting in charges between $303.20 and $1,157.47 for each session of TCD they purported to provide.

### a.  Legitimate Uses for TCD

143.    TCD is an ultrasound technique that uses sound waves to evaluate blood flow (blood circulation) in and around the brain.

144.    TCD typically uses a Doppler Transducer that enables recording of blood flow velocities from intracranial arteries through selected cranial foramina and thin regions of the skull. Mapping of the sampled velocities as a color display of spectra locates the major brain arteries in three dimensions.

145.    TCD obtains information about the physiology of blood flow through the intracranial cerebrovascular system.

146.    Depending on the type of measurement needed, TCD studies can take at least 45 minutes, if not more.

147.   TCD evaluation of the intracranial cerebrovascular system is generally used in connection with the following:

(i)     Vasospasm, following a ruptured brain aneurysm;

(ii)    Sickle cell anemia, to determine a patient's stroke risk;

(iii)   Ischemic stroke;

(iv)    Intracranial stenosis or blockage of the blood vessels;

(v)     Cerebral microemboli; or

(vi)    Patent Foramen Ovale, a hole in the heart that does not close properly after birth, which may provoke embolic stroke.

148.   The symptomology of the above-named conditions includes sudden severe headache with no known cause; numbness, weakness, or paralysis of the face, arm, leg, or one side of the body; confusion; trouble speaking, seeing, or walking; and/or sudden dizziness, loss of balance, or loss of coordination.

149.   Headaches or dizziness following head trauma are not indications for TCD studies of the intracranial cerebrovascular system.

150.   Moreover, in the event the Insureds did suffer from any such symptoms, the onset of those symptoms was nether sudden nor unexplained but rather a purported result of the motor vehicle accidents that caused them to seek treatment at the No-Fault Clinics in the first instance.

151.   In a legitimate setting, if a medical doctor needs to examine a patient's intracranial blood flow he or she orders a magnetic resonance angiogram ("MR angiogram") or a computed tomography angiogram ("CT angiogram"), both of which measure intracranial blood flow with more accuracy than TCD.

152.   Indeed, there are virtually no clinical indications for TCD in an outpatient setting.

**b.  The Defendants' Fraudulent TCD Charges**

153.    The Defendants did not perform independent evaluations on Insureds to determine if the TCD was medically necessary.

154.    Instead, the Defendants performed the TCD pursuant to referrals from the Referring Providers.

155.    In keeping with the fact that the TCD was performed pursuant to predetermined treatment protocols, the medical examinations performed by the Referring Providers often failed to screen for the symptoms that would warrant TCD.

156.    To the extent the Referring Providers conducted medical examinations that assessed the Insureds' head pain and neurological symptoms, in virtually all cases where the Defendants purported to provide TCD, the Insureds did not suffer any sort of injury as the result of the automobile accident that would warrant the TCD.

157.    Indeed, in keeping with the fact that that the TCD was medically useless and performed on a protocol basis rather than to benefit any of the Insureds, the diagnoses generated by the Referring Providers and listed on the Provider Defendants' billing to justify the TCD they administered to Insureds were often directly contradicted by the medical records generated by the Referring Providers.

158.    Despite virtually none of the Insureds who received TCD displaying symptoms warranting the testing, the Defendants submitted, or caused to be submitted, hundreds of thousands of dollars in bills for TCD to GEICO.

159.    Specifically, virtually none of the Insureds who received TCD at Fish Medical or Complete Express reported suffering sudden or unexplained severe headaches, numbness or weakness, confusion, trouble speaking, seeing, or walking, and/or sudden dizziness, loss of balance, and/or coordination.

160.     Moreover, it is extremely improbable – to the point of impossibility – that multiple Insureds involved in the same automobile accident would routinely require TCD at or about the same time.

161.     Even so, and in keeping with the fact that the TCD purportedly performed by the Defendants was not medically necessary and was performed pursuant to predetermined protocols to maximize profits, Fish and Fish Medical routinely provided TCD to multiple Insureds involved in the same accident at or about the same time.

162.     For example:

(i)      On October 4, 2020, two insureds – MT and CL - were involved in the same automobile accident. Thereafter, MT and CL both - incredibly - received TCD from Fish Medical on November 6, 2021.

(ii)     On January 1, 2021, two insureds – JB and DJB - were involved in the same automobile accident. Thereafter, JB and DJB both - incredibly - received TCD from Fish Medical on February 8, 2021.

(iii)    On November 8, 2020, two insureds – BC and BC - were involved in the same automobile accident. Thereafter, BC and BC both - incredibly - received TCD from Fish Medical on November 23, 2020 and December 14, 2020, respectively.

(iv)     On August 24, 2020, two insureds – BP and ZH - were involved in the same automobile accident. Thereafter, BP and ZH both - incredibly - received TCD from Fish Medical on September 14, 2020 and October 5, 2020, respectively.

(v)      On August 16, 2020, two insureds – JD and SJ - were involved in the same automobile accident. Thereafter, JD and SJ both - incredibly - received TCD from Fish Medical on November 23, 2020 and December 9, 2020, respectively.

(vi)     On August 25, 2020, three insureds – AS, JV, and CC - were involved in the same automobile accident. Thereafter, AS, JV, and CC all - incredibly - received TCD from Complete Express on August 31, 2020.

(vii)    On April 7, 2020, two insureds – BM and DM - were involved in the same automobile accident. Thereafter, BM and DM both - incredibly - received TCD from Complete Express on August 5, 2020.

(viii)   On April 14, 2020, two insureds – NC and MC - were involved in the same automobile accident. Thereafter, NC and MC both - incredibly - received TCD from Complete Express on July 27, 2020.

(ix)   On August 13, 2020, two insureds – YF and BO - were involved in the same automobile accident. Thereafter, YF and BO both - incredibly - received TCD from Complete Express on August 25, 2020.

(x)   On March 6, 2020, two insureds – SO and BB - were involved in the same automobile accident. Thereafter, SO and BB both - incredibly - received TCD from Complete Express on August 12, 2020.

163.   These are only representative examples.

164.   In many of the claims identified in Exhibits "1" and "2", two or more Insureds involved in the same underlying accident received TCD from Fish Medical or Complete Express at or about the same time, even though the Insureds were differently situated.

165.   As with the other Fraudulent Services, the TCD was rendered and billed pursuant to the Defendants' fraudulent treatment and billing protocol designed solely to financially enrich the Defendants, rather than to benefit any of the Insureds who supposedly were subjected to the tests.

166.   Indeed, even had the Insureds displayed symptoms warranting TCD, in a legitimate clinical setting the practitioner would initially administer a transcranial doppler study of the intracranial arteries, billed using CPT code 93886 or CPT code 93888, and would only proceed to perform a vasoreactivity test, billed using CPT code 93890 if the Insured displayed symptomology warranting that additional testing. Nevertheless, the Provider Defendants routinely purported to provide vasoreactivity test billed using CPT code 93890 simultaneous with study of the intracranial arteries, billed using CPT code 93886 or 93888.

167.   In keeping with the fact that the Defendants performed TCD – to the extent performed at all – pursuant to a predetermined fraudulent protocol and not for the benefit of Insureds, in virtually every instance, the reports generated by the Provider Defendants as a result

of the TCD failed to contain any actual data points or analysis regarding the TCD. Rather the charges for TCD were frequently bundled alongside other Cardiovascular Imaging resulting in reports that, though boilerplate in nature, discussed the results of the Cardiovascular Imaging without providing any TCD results.

      **5.**      **Fish's Failure to Practice Through Fish Medical and Complete Express**

168.      N.Y. Business Corporation Law § 1507 makes clear that a physician shareholder of a medical professional corporation must be engaged in the practice of medicine through the professional corporation for it to be lawfully licensed. Section 1507 provides as follows:

> ***Issuance of shares***
>
> A professional service corporation may issue shares only to individuals who are authorized by law to practice in this state a profession which such corporation is authorized to practice and who are or have been engaged in the practice of such profession in such corporation…or who will engage in the practice of such profession in such corporation within thirty days of the date such shares are issued….All shares issued, agreements made, or proxies granted in violation of this section shall be void.

169.      Legislative history confirms that a medical professional corporation's putative physician-owner not only must be licensed to practice medicine but must also be engaged in the practice of medicine through the medical professional corporation.  For example, in commenting on the proposed amendment to Section 1507 in 1971, the State Education Department stated:

> This bill amends the Business Corporation Law in relation to the operation of professional service corporations.  While this bill allows more flexibility in the ownership and transfer of professional service corporation stock, it maintains the basic concept of restricting ownership to professionals working within the corporation.

170.      Similarly, the New York Department of State commented that:

> Section 1507 currently limits issuance of shares in such corporation to persons licensed by this State to practice the profession which the corporation is authorized to practice and who so practice in such corporation or a predecessor entity.
> The bill would add a third category of person eligible to receive stock, one who will practice such profession "within 30 days of the date such shares are issued."

171.    New York's Department of Health was of the same opinion, commenting that:

> The bill would amend Article 15 of the Business Corporation Law pertaining to professional service corporations <u>to allow the issuance of shares of individuals who will engage in the practice of the profession within 30 days of the date such shares are issued, in addition to those presently so engaged</u>….  (emphasis added.)

Copies of the memoranda are annexed hereto as Exhibit "3".

172.    Since at least 2020, Fish has not legitimately engaged in the practice of medicine through the Provider Defendants as required by New York law.

173.    In fact, as of at least as of 2020, Fish has resided full-time outside of the state of New York, either in Florida or Connecticut, and could not have performed any of the medical services for the Provider Defendants.

174.    Specifically, Fish has a full-time pediatrics practice operating out of St. Vincent's Medical Center in Bridgeport, Connecticut.

175.    Additionally, Fish does not supervise any of the treatment or services that allegedly are provided to patients of the Provider Defendants. Nor does Fish train any of the medical professionals that allegedly provide medical services for the Provider Defendants.

176.    Fish does not work at any of the No-Fault Clinics where the Provider Defendants allegedly provide treatment and/or testing services.

177.    Notably, Fish has never been, and is, not qualified to provide and/or supervise any of the Fraudulent Services that are allegedly provided by the medical professionals associated with the Provider Defendants.

178.    For example, Fish is a physician specializing in pediatric medicine, and has neither the training nor the medical expertise to perform; (i) cardiopulmonary exercise testing; (ii) cardiac and vascular imaging; (iii) VNG; or (iv) TCD.

179.     Critically, Fish is not actually capable of: (i) performing these services that were purportedly conducted on GEICO Insureds; (ii) interpreting the results of the testing or treatment records; or (iii) supervising the services that were purportedly performed by the medical professionals working for the Provider Defendants.

180.     Fish's failure and inability to practice medicine through the Provider Defendants as well as her failure and/or inability to properly hire, train, or supervise the physicians who perform services billed using the name of the Provider Defendants, compromises patient care and leads to excessive and/or unnecessary testing.

### III.     The Fraudulent Billing Defendants Submitted or Caused to be Submitted to GEICO

181.     To support their fraudulent charges, Defendants systematically submitted or caused to be submitted hundreds of NF-3, HCFA-1500 forms, and/or treatment reports through the Provider Defendants to GEICO seeking payment for the Fraudulent Services for which the Defendants were not entitled to receive payment.

182.     The NF-3, HCFA-1500 forms, and/or treatment reports submitted to GEICO by and on behalf of the Provider Defendants were false and misleading in the following material respects:

(i)     The NF-3, HCFA-1500 forms and supporting documentation submitted by and on behalf of the Provider Defendants uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary. In fact, the Fraudulent Services were not medically necessary and were provided pursuant to pre-determined fraudulent protocols designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds;

(ii)     The NF-3, HCFA-1500 forms and supporting documentation submitted by and on behalf of the Provider Defendants uniformly misrepresented to GEICO that the Fraudulent Services were causally related to the Insureds' motor vehicle accidents. In fact, the Fraudulent Services were not causally related to the Insureds' motor vehicle accidents and were provided pursuant to pre-determined fraudulent protocols designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds;

    (iii)    The NF-3 forms, HCFA-1500 forms, and treatment reports submitted by and on behalf of the Provider Defendants uniformly fraudulently concealed the fact that the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to illegal kickback and referral arrangements amongst the Defendants and others; and

    (iv)    The NF-3 forms, HCFA-1500 forms, and treatment reports submitted by and on behalf of the Provider Defendants uniformly fraudulently concealed the fact that the Provider Defendants are professional corporations operating in violation of material licensing laws in that they are medical professional corporations nominally owned by physicians who do not actually practice medicine through the professional corporations.

## IV.    Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

183.    The Defendants legally and ethically were obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to GEICO.

184.    To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, the Defendants systemically concealed their fraud and went to great lengths to accomplish this concealment.

185.    Specifically, the Defendants knowingly misrepresented and concealed facts related to the Provider Defendants in an effort to prevent discovery of the fact that the Provider Defendants unlawfully exchanged kickbacks for patient referrals.

186.    Additionally, the Defendants entered into complex financial arrangements with one another that were designed to, and did, conceal the fact that the Provider Defendants unlawfully exchanged kickbacks for patient referrals.

187.    Furthermore, the billing and supporting documentation submitted by the Provider Defendants for the Fraudulent Services, when viewed in isolation, did not reveal its fraudulent nature.

188.    Nevertheless, Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary and

performed – to the extent they were performed at all – pursuant to fraudulent pre-determined protocols designed to maximize the charges that could be submitted, rather than to benefit the Insureds who supposedly were subjected to the Fraudulent Services.

189.    In addition, the Defendants knowingly misrepresented and concealed facts related to the employment status of the health care professionals associated with the Fish Medical in order to prevent GEICO from discovering that the health care professionals performing many of the Fraudulent Services were not employed by the Provider Defendants.

190.    The Defendants also hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely filed expensive and time-consuming litigation against GEICO and other insurers if the charges were not promptly paid in full.

191.    The Defendants' collection efforts through numerous separate No-Fault collection proceedings, which proceedings may continue for years, is an essential part of their fraudulent scheme since they know it is impractical for an arbitrator or civil court judge in a single No-Fault arbitration or civil court proceeding, typically involving a single bill, to uncover or address the Defendants' large scale-scale, complex fraud scheme involving numerous patients across numerous different clinics located throughout the metropolitan area.

192.    GEICO is under statutory and contractual obligations to process claims promptly and fairly within 30 days. The facially-valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO incurred damages of more than $159,000.00 based upon the fraudulent charges.

193.     Based upon Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

## AS AND FOR A FIRST CAUSE OF ACTION
### Against All Defendants
### (Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)

194.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

195.     There is an actual case in controversy between GEICO and the Defendants regarding approximately $285,000.00 in fraudulent billing for the Fraudulent Services that has been submitted to GEICO using the names of the Provider Defendants.

196.     Specifically, there is approximately $156,052.16 in pending fraudulent billing from Fish Medical and approximately $129,300.58 in pending fraudulent billing from Complete Express.

197.     The Defendants have no right to receive payment for any pending bills submitted to GEICO because the Fraudulent Services were not medically necessary, not casually related to the Insured's motor vehicle accidents, and were provided – to the extent provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

198.     The Defendants have no right to receive payment for any pending bills submitted to GEICO because the Fraudulent Services in many cases, were never provided in the first instance, and the billing codes used for the Fraudulent Services misrepresented and exaggerated the level and type of services that purportedly were provided in order to inflate the charges submitted to GEICO;

199.    The Defendants have no right to receive payment for any pending bills submitted to GEICO because the Fraudulent Services were provided – to the extent provided at all – pursuant to illegal kickback arrangements amongst the Defendants, and others.

200.    The Defendants have no right to receive payment for any pending bills submitted to GEICO because the Provider Defendants are professional corporations operating in violation of material licensing laws in that they are medical professional corporations nominally owned by physicians who do not actually practice medicine through the professional corporations.

201.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that:

(i)     The Defendants have no right to receive payment for any pending bills submitted to GEICO using the names of the Provider Defendants because the Fraudulent Services were not medically necessary or causally related to the Insureds' motor vehicle accidents and were provided – to the extent provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(ii)    The Defendants have no right to receive payment for any pending bills submitted to GEICO using the names of the Provider Defendants because the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to illegal kickback arrangements amongst the Defendants and others;

(iii)   The Defendants have no right to receive payment for any pending bills submitted to GEICO because the in many cases, the Fraudulent Services were never provided in the first instance, and the billing codes used for the Fraudulent Services misrepresented and exaggerated the level and type of services that purportedly were provided in order to inflate the charges submitted to GEICO; and

(iv)    The Defendants have no right to receive payment for any pending bills submitted to GEICO using the names of the Provider Defendants because the Provider Defendants are professional corporations operating in violation of material licensing laws in that they are medical professional corporations nominally owned by physicians who do not actually practice medicine through the professional corporations.

## AS AND FOR A SECOND CAUSE OF ACTION

### Against Fish
### (Violation of RICO, 18 U.S.C. § 1962(c))

202.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

203.    Fish Medical is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

204.    Fish knowingly have conducted and/or participated, directly or indirectly, in the conduct of Fish Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for more than two years seeking payments that Fish Medical was not eligible to receive using the No-Fault Laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich Defendants; (iii) Fish Medical obtained its patients through the Defendants' illegal kickback scheme; (iv) the billed for services, in many cases, were never provided in the first instance, and the billing codes misrepresented and exaggerated the level and type of services that purportedly were provided in order to inflate the charges submitted to GEICO; and (v) the billed-for services were provided – to the extent provided at all – through professional corporations nominally owned by physicians who do not actually practice medicine through the professional corporations.

205.    The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "1".

206.    Fish Medical's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular ways in which Fish operated Fish Medical, inasmuch as Fish Medical never was eligible to bill for or collect No-Fault Benefits and acts of mail fraud therefore were essential in order for Fish Medical to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Defendants continue to attempt collection on the fraudulent billing submitted through Fish Medical to the present day.

207.    Fish Medical is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers.  These inherently unlawful acts are taken by Fish Medical in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

208.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $83,000.00 pursuant to the fraudulent bills submitted by the Defendants through Fish Medical.

209.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### AS AND FOR A THIRD CAUSE OF ACTION

**Against Fish and Fish Medical**
**(Common Law Fraud)**

210.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

211.   Fish and Fish Medical intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

212.   The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Fish Medical was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it was not properly licensed in that it obtained patients through an illegal kickback scheme; (ii) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary and were performed and billed pursuant to a pre-determined, fraudulent protocol designed solely to enrich Fish and Fish Medical; (iii) in many claims, the billed for services were provided to the Insured but were not actually provided in the first instance; and (iii) in every claim, the representation that Fish Medical was in compliance with all material licensing laws when in fact Fish Medical is nominally owned by a physician who does not actually practice medicine through the professional corporation. The fraudulent billings and corresponding mailings submitted to GEICO that comprise the fraudulent activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "1".

213.   Fish and Fish Medical intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Fish Medical that were not compensable under the No-Fault Laws.

214.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $83,000.00 pursuant to the fraudulent bills submitted by Fish through Fish Medical.

215.     Fish and Fish Medical's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

216.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### AS AND FOR A FOURTH CAUSE OF ACTION

**Against Fish and Fish Medical**
**(Unjust Enrichment)**

217.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

218.     As set forth above, Fish and Fish Medical have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

219.     When GEICO paid the bills and charges submitted by or on behalf of Fish Medical for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

220.     Fish and Fish Medical have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

221.     Fish and Fish Medical's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

222.     By reason of the above, Fish and Fish Medical have been unjustly enriched in an amount to be determined at trial, but in no event less than $83,000.00.

## AS AND FOR A FIFTH CAUSE OF ACTION

### Against Fish
### (Violation of RICO, 18 U.S.C. § 1962(c))

223.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

224.    Complete Express is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

225.    Fish knowingly have conducted and/or participated, directly or indirectly, in the conduct of Complete Express's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for more than two years seeking payments that Complete Express was not eligible to receive under the No-Fault Laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich Defendants; (iii) Complete Express obtained its patients through the Defendants' illegal kickback scheme; (iv) the billed for services, in many cases, were never provided in the first instance, and the billing codes misrepresented and exaggerated the level and type of services that purportedly were provided in order to inflate the charges submitted to GEICO; and (v) the billed-for services were provided – to the extent they were provided at all – through professional corporations nominally owned by physicians who do not actually practice medicine through the professional corporations.

226.    The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "2".

227.    Complete Express's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular ways in which Fish operated Complete Express, inasmuch as Complete Express never was eligible to bill for or collect No-Fault Benefits and acts of mail fraud therefore were essential in order for Complete Express to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Defendants continue to attempt collection on the fraudulent billing submitted through Complete Express to the present day.

228.    Complete Express is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers.  These inherently unlawful acts are taken by Complete Express in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

229.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $75,000.00 pursuant to the fraudulent bills submitted by the Defendants through Complete Express.

230.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### AS AND FOR A SIXTH CAUSE OF ACTION
**Against Fish and Complete Express**
**(Common Law Fraud)**

231.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

232.    Fish and Complete Express intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

233.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Complete Express was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it was not properly licensed in that it obtained patients through an illegal kickback scheme; (ii) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary and were performed and billed pursuant to a pre-determined, fraudulent protocol designed solely to enrich Fish and Complete Express; (iii) in many claims, the billed for services were provided to the Insured but were not actually provided in the first instance; and (iv) in every claim, the representation that Complete Express was in compliance with all material licensing laws when in fact Complete Express is nominally owned by a physician who does not actually practice medicine through the professional corporation. The fraudulent billings and corresponding mailings submitted to GEICO that comprise the fraudulent activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "2".

234.    Fish and Complete Express intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Complete Express that were not compensable under the No-Fault Laws.

235.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $75,000.00 pursuant to the fraudulent bills submitted by Fish through Complete Express.

236.    Fish and Complete Express's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

237.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### AS AND FOR A SEVENTH CAUSE OF ACTION

**Against Fish and Complete Express**
**(Unjust Enrichment)**

238.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

239.    As set forth above, Fish and Complete Express have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

240.    When GEICO paid the bills and charges submitted by or on behalf of Complete Express for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

241.    Fish and Complete Express have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

242.    Fish and Complete Express's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

243.    By reason of the above, Fish and Complete Express have been unjustly enriched in an amount to be determined at trial, but in no event less than $75,000.00.

### JURY DEMAND

244.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a judgment be entered in their favor and against the Defendants, as follows:

A.  On the First Cause of Action against Fish, Fish Medical, and Complete Express, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Fish, Fish Medical, and Complete Express have no right to receive payment for any pending bills submitted to GEICO;

B.  On the Second Cause of action against Fish, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $83,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.  On the Third Cause of Action against Fish Medical and Fish, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $83,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper; and

D.  On the Fourth Cause of Action against Fish, more than $83,000.00 in compensatory damages, plus costs and interest, and such other and further relief as this Court deems just and proper.

E.  On the Fifth Cause of action against Fish, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $75,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

F.  On the Sixth Cause of Action against Fish and Complete Express, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $75,000.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper; and

G.      On the Seventh Cause of Action against Fish and Complete Express, more than

$75,000.00 in compensatory damages, plus costs and interest and such other and further relief as this

Court deems just and proper.

Dated: Uniondale, New York
        November 21, 2022

                              RIVKIN RADLER LLP


                              By:    /s/ *Barry I. Levy*
                                    Barry I. Levy (BL 2190)
                                    Michael A. Sirignano (MS 5263)
                                    Joshua D. Smith (JS 3989)
                              926 RXR Plaza
                              Uniondale, New York 11556
                              (516) 357-3000

                              *Counsel for Plaintiffs, Government Employees*
                              *Insurance Company, GEICO Indemnity*
                              *Company, GEICO General Insurance Company*
                              *and GEICO Casualty Company*

57